**Counsel of Record:**

Stephan J. Schlegelmilch
Bridget M. Fitzpatrick
Daniel M. Hawke
Antonia Chion
Robert A. Cohen
Jason J. Burt
Carolyn M. Welshhans
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4935 (Schlegelmilch)
Facsimile: (202) 772-9292 (Schlegelmilch)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                              :

| | |
|---|---|
| **UNITED STATES SECURITIES AND** : | |
| **EXCHANGE COMMISSION** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **vs.** : | **Civil No.** |
| : | |
| **VLADIMIR EYDELMAN** : | |
| **and** : | |
| **STEVEN METRO,** : | |
| : | **Jury Trial Demanded** |
| **Defendants.** : | |

_____ :

**COMPLAINT**

       Plaintiff United States Securities and Exchange Commission (the "Commission"), 100 F Street, N.E., Washington, DC 20549, for its Complaint against Defendants Vladimir Eydelman ("Eydelman"), whose last known address is 3 Fulling Mill Lane, Colts Neck, NJ 07722, and Steven Metro ("Metro"), whose last known address is 32 Old Village Lane, Katonah, NY 10536, alleges as follows:

## SUMMARY

1.      This is an insider trading case.  The scheme involved three participants:
(1) Metro, the source and a law firm employee, who over the course of several years repeatedly stole material, nonpublic information about pending mergers and acquisitions and tender offers from his employer, Simpson Thacher & Bartlett LLP ("Simpson Thacher"), an international law firm that serves as legal adviser to many companies considering corporate transactions or acquisitions; (2) a middleman ("Middleman"), who passed along the information to Eydelman and himself traded in at least 12 instances; and (3) Eydelman, the Middleman's broker, who received the tips from the Middleman and traded himself and on behalf of his customers on the basis of the material, nonpublic information in at least 13 instances.

2.      From at least February 2009 through the present (the "Relevant Period"), Metro was an employee of Simpson Thacher.  Metro repeatedly accessed material, nonpublic information on Simpson Thacher's computer systems during the Relevant Period to identify documents establishing that a client of the firm was about to participate in a corporate transaction.  He then arranged meetings with the Middleman at bars and coffee shops in New York City and passed on the material, nonpublic information with the understanding that the Middleman would use the information to trade.

3.      The Middleman then passed the information to his friend and stockbroker, Eydelman.  Except at the very beginning of the scheme, the passing of material, nonpublic information occurred at the same location – Grand Central Station.  The Middleman passed the information to Eydelman by showing him a post-it note or napkin on which the Middleman wrote the stock ticker symbol of the company to be acquired.  The Middleman then chewed up, and sometimes ate (with Eydelman watching), the post-it note or napkin to destroy evidence of

2

the tip.  The Middleman also conveyed to Eydelman at this time the approximate transaction price and timing of the deal.  Following this interaction, Eydelman returned to his office, typically gathered research relating to the target company, and e-mailed the Middleman the research, and/or Eydelman's supposed thoughts as to why buying the stock made sense, with the intent to create a paper trail of false and contrived emails that purportedly served as non-fraudulent bases for the illegal trading by the Middleman and Eydelman.

4.       Eydelman knew that the information passed to him was material and nonpublic and that the Middleman had received it from a friend who worked at a law firm.  Indeed, in a recent meeting between the Middleman and Eydelman, the Middleman brought up the "boy at the law firm," to which Eydelman responded, "What's up with him . . . does he still have the info?"

5.       Metro and the Middleman had an agreement that called for the Middleman to allot a portion of the illicit profits to Metro and keep this allotment in the Middleman's brokerage account.  Metro and the Middleman discussed how much of the allotment Metro wanted to use to trade when he identified new deals involving Simpson Thacher clients.  As the scheme continued, Metro's portion of the illicit profits in the Middleman's brokerage account grew.

6.       The parties deliberately structured their scheme this way to avoid detection, allowing Metro to share in the proceeds of the insider trading without fear of discovery for trading on information he obtained in the course of his employment and enabling Eydelman and the Middleman to profit without being connected to a source with access to inside information.

7.       The Middleman and Eydelman used the material, nonpublic information obtained from Metro to trade the target companies' securities, personally and on behalf of their family members; Eydelman further traded on behalf of more than 50 of his brokerage customers, for

3

which he received substantial commissions.  The trading by the Middleman, Eydelman, and Eydelman's customers included both stock and options transactions.  Metro also personally traded in advance of at least two transactions.  The Middleman and Eydelman sometimes also communicated with their friends, who then also traded in advance of the announcements.

8.      Over the course of three and half years, this insider trading scheme involved transactions in at least 13 issuers' securities and yielded over $5.6 million in illegal profits to the defendants and the Middleman, their families and friends, and Eydelman's customers.  Eydelman also earned substantial commissions as a result of this trading in his customers' accounts.  And Eydelman received bonuses from his employers based on his performance that were driven in large part by the profits garnered through the insider trading scheme.  The Middleman's agreement with Metro resulted in over $168,000 being apportioned to Metro as his share of profits from the insider trading scheme, in addition to the profits reaped by Metro from his personal trading in advance of at least two of the transactions.

9.      By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Eydelman and Metro violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77q(a)*], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder, and Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

10.     The Commission seeks permanent injunctions against each of the defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all profits realized or losses avoided from the unlawful insider trading activity set forth herein, and civil penalties pursuant to Section 21(d)(3) of the Exchange Act

[*15 U.S.C. § 78u(d)(3)*].  The Commission also brings this action pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-l*] for civil penalties against the defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988, and for such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11.    The Commission brings this action pursuant to Section 20(b) of the Securities Act [*15 U.S.C. § 77t(b)*] and Sections 21(d) and 21A of the Exchange Act [*15 U.S.C. §§ 78u(d) and 78u-1*], to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

12.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

13.    Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Eydelman is a resident of New Jersey, and certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of New Jersey and elsewhere, and were effected, directly or indirectly, by making the use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## THE DEFENDANTS

14.    **Defendant Vladimir Eydelman**, age 42, is a resident of Colts Neck, New Jersey. Eydelman was a registered representative employed by Oppenheimer & Co., Inc. ("Oppenheimer") from March 19, 2001, until September 9, 2012.  He currently is employed as a

registered representative with Morgan Stanley and has series 7, 24, 63, and 65 designations.

Prior to leaving Oppenheimer in September 2012, Eydelman managed approximately 445

customer accounts.  As of March 2013, Eydelman had approximately 262 customer accounts that

he serviced through Morgan Stanley.  Eydelman or the accounts of his family members or

brokerage customers made timely purchases of securities before 13 of the announcements of

mergers or acquisitions or tender offers that are the subject of this action.  Eydelman further

communicated with his friends who then made timely purchases of securities in advance of at

least five of the announcements that are the subject of this action.  Eydelman is a friend of the

Middleman and is his stock broker.

15.     **Defendant Steven Metro**, age 40, is a resident of Katonah, New York.  Metro

currently is employed by Simpson Thacher as a managing clerk.  He has a law degree from

Touro College of Law in Central Islip, New York but is not a practicing attorney.  Metro and the

Middleman are friends who met in approximately 1995, during their first year of law school.

Metro made timely purchases of securities before two of the announcements that are the subject

of this action and entered into an agreement with the Middleman that apportioned some of the

proceeds from the illegal transactions to Metro.

## RELEVANT ISSUERS AND ANNOUNCEMENTS

16.     **Brink's Home Security Holdings, Inc. ("Brink's")** is a Virginia corporation

headquartered in Irving, Texas.  At all relevant times, Brink's common stock was registered with

the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York

Stock Exchange ("NYSE").  The company installs, services, and monitors security system

alarms for residential and commercial properties.  On January 18, 2010, Tyco International Ltd.

6

("Tyco") entered into a definitive agreement to acquire Brink's.  Simpson Thacher advised Tyco in connection with the transaction.

17.    **CNA Surety Corp. ("CNA Surety")** is a Delaware corporation headquartered in Chicago, Illinois.  At all relevant times, CNA Surety's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company is a provider of surety and surety-related products, ranging from small commercial bonds to large contract bonds.  On November 1, 2010, CNA Financial Corporation ("CNA Financial") announced its intention to acquire all of the outstanding shares of common stock of CNA Surety.  Simpson Thacher advised CNA Financial in connection with the tender offer.

18.    **Collective Brands, Inc. ("Collective Brands")** is a Delaware corporation headquartered in Topeka, Kansas.  At all relevant times, Collective Brands' common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company sells lifestyle, fashion, and performance brands to consumers worldwide. On May 1, 2012, Collective Brands announced that it entered into a definitive agreement under which Collective Brands would be acquired by a consortium comprised of Wolverine Worldwide, Blum Capital Partners, and Golden Gate Capital.  Simpson Thacher advised JPMorgan Securities LLC and JPMorgan Chase Bank, N.A. in connection with financing a portion of Wolverine Worldwide's acquisition of Collective Brands.

19.    **Graham Packaging Company Inc. ("Graham")** is a Delaware corporation headquartered in York, Pennsylvania.  At all relevant times, Graham's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company manufactures and sells custom plastic packaging products to food and beverage, household, personal care and automotive lubricants products companies.  On April 13,

2011, Silgan Holdings Inc. entered into a definitive agreement to acquire Graham.  Simpson Thacher advised Graham in connection with the transaction.

20.     **International Coal Group, Inc. ("International Coal")** is a Delaware corporation headquartered in Scott Depot, West Virginia.  At all relevant times, International Coal's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company owns, mines, and produces steam and coal.  On May 1, 2011, Arch Coal, Inc. announced a tender offer to acquire International Coal. Simpson Thacher advised Arch Coal, Inc. in connection with the transaction.

21.     **OfficeMax Inc. ("OfficeMax")** is a Delaware corporation headquartered in Naperville, Illinois.  At all relevant times, OfficeMax's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company sells office supplies to various consumers.  On February 20, 2013, Office Depot, Inc. announced that it would acquire OfficeMax.  Simpson Thacher advised Office Depot, Inc. in connection with the transaction.

22.     **PharMerica Corporation ("PharMerica")** is a Delaware corporation headquartered in Louisville, Kentucky.  At all relevant time, PharMerica's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company provides pharmacy products and services in various care settings.  On August 23, 2011, Omnicare, Inc. ("Omnicare") announced a tender offer for PharMerica.  Upon information and belief, Simpson Thacher advised PharMerica, Omnicare, or another party involved in the possible corporate transaction concerning PharMerica.

23.     **Sealy Corporation ("Sealy")** is a Delaware corporation headquartered in Trinity, North Carolina.  At all relevant times, Sealy's common stock was registered with the

Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company manufactures and markets bedding products, including mattresses and mattress foundations.  On September 26, 2012, Tempur-Pedic International Inc. entered into a definitive agreement to acquire Sealy.  Simpson Thacher advised Sealy in connection with the transaction.

24.     **Sirius XM Radio Inc. ("Sirius")** is a Delaware corporation headquartered in New York, New York.  At all relevant time, Sirius's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  The company broadcasts news, sports, and other channels over satellite radio systems.  On February 17, 2009, Liberty Media Corporation announced its intent to lend Sirius $530 million. Simpson Thacher advised Sirius in connection with the transaction.

25.     **SMART Modular Technologies (WWH), Inc. ("SMART Modular")** is a Cayman Islands corporation headquartered in Newark, California.  At all relevant times, SMART Modular's ordinary shares were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  The company is a designer, manufacturer and supplier of memory modules and solid state storage products.  On April 26, 2011, Silver Lake Partners and Silver Lake Sumeru entered into a definitive agreement to acquire SMART Modular.  Simpson Thacher advised both Silver Lake entities in connection with the transaction.

26.     **Smithtown Bancorp Inc. ("Smithtown")** is a New York corporation headquartered in Hauppauge, New York.  At all relevant times, Smithtown's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  The company provides a range of banking services to consumers, businesses and municipalities located primarily within the greater New York City area.  On July 15, 2010,

9

Smithtown announced its entry into a definitive agreement to merge with People's United Financial, Inc. ("People's").  Simpson Thacher advised People's in connection with the transaction.

27.     **Vital Images, Inc. ("Vital")** is a Minnesota corporation headquartered in Minnetonka, Minnesota.  At all relevant times, Vital's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  The company provides visualization and image analysis to medical professionals.   On April 27, 2011, Vital announced that it had accepted Toshiba Medical Systems Corp.'s ("Toshiba") tender offer.  Simpson Thacher advised Toshiba in connection with the transaction.

28.     **Company A** is a Delaware corporation.  At all relevant times, Company A's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  Upon information and belief, in 2012 Simpson Thacher advised Company A or another party involved in a possible corporate transaction between Company A and another company.  Upon information and belief, this possible corporate transaction did not or has not yet occurred, nor has it been made public.

## OTHER RELEVANT PEOPLE AND ENTITIES

29.     **The Middleman**, age 40, is a resident of New York.  The Middleman is a longtime friend of both Eydelman and Metro, and he has been a brokerage customer of Eydelman since at least 2003.  The Middleman and his family members made timely purchases in the securities of 12 of the 13 issuers that are the subject of this action.  The Middleman also reached an agreement with Metro to apportion to Metro some of the proceeds from the illegal transactions.

30.     **Simpson Thacher & Bartlett LLP ("Simpson Thacher")** is an international, full-service law firm headquartered in New York, New York.  It employs approximately 800 lawyers in ten offices worldwide.  According to its website, Simpson Thacher is especially well known for "provid[ing] coordinated legal advice on the largest and most complex corporate transactions."  At all relevant times, Metro was employed by Simpson Thacher as a managing clerk.

31.     **Oppenheimer & Co. ("Oppenheimer")** is an investment bank and full-service investment firm, providing broker-dealer services to clients.  The firm is headquartered in New York with offices in 26 states and six foreign countries.  Eydelman worked at Oppenheimer from March 2001 until September 2012.  Eydelman and the Middleman owned and controlled several brokerage accounts at Oppenheimer during the term of Eydelman's employment.

32.     **Morgan Stanley & Co. LLC ("Morgan Stanley")** is a broker-dealer that offers services to financial institutions and individuals, including brokerage and investment advisory services.  According to Morgan Stanley's website, it manages more than $1.7 trillion in client assets through 17,000 representatives in 740 locations.  Eydelman has worked at Morgan Stanley since September 2012.  Eydelman and the Middleman owned and controlled several brokerage accounts at Morgan Stanley during the term of Eydelman's employment.

### STATEMENT OF FACTS

### Metro, the Middleman, and Eydelman's Relationship

33.     Metro and the Middleman have been friends since approximately 1995, when they both attended Touro College of Law together.  During and prior to the Relevant Period, the two met for drinks, attended social functions together, and regularly traveled together to various Atlantic City casinos.

34.     Prior to and during the Relevant Period, Metro and the Middleman communicated by telephone, email, text message, and in-person, and their communications surged shortly before each of the 13 transaction announcements referenced above.  The Middleman knew that Metro worked at Simpson Thacher.  Indeed, Metro and the Middleman exchanged nearly 100 emails using Metro's Simpson Thacher email account.

35.     Metro knew, based on conversations with the Middleman, that the Middleman passed the material, nonpublic information he received from Metro to his stockbroker.

36.     The Middleman and Eydelman have known each other since at least 2003, when the two met at a party thrown by a mutual friend.   The Middleman subsequently opened a brokerage account at Oppenheimer for which Eydelman served as the registered representative. In September 2012, Eydelman changed employers from Oppenheimer to Morgan Stanley.  Soon thereafter, the Middleman transferred his accounts to Morgan Stanley and to Eydelman.

37.     The Middleman and Eydelman are friends.  Prior to and during the Relevant Period, the two spoke frequently and attended sporting events and social functions together. Eydelman knew that the Middleman's source was a friend at a law firm, and that the material, nonpublic information that the Middleman provided to Eydelman came from this source.

### Metro Accessed Material, Nonpublic Information While Employed by Simpson Thacher

38.     Metro worked at Simpson Thacher during the Relevant Period.

39.     Upon information and belief, Simpson Thacher served as an adviser to a party involved in each of the 13 transaction announcements referenced above (including, in at least one instance, a party providing financing for the transaction).  As an adviser, Simpson Thacher obtained material, nonpublic information regarding the transactions, including the parties, the timing, and the transaction price.

40.     Simpson Thacher owed and owes fiduciary duties of loyalty and confidentiality to, among others, its clients, which includes an obligation to maintain the confidentiality of information obtained by, or provided to, Simpson Thacher and its employees in connection with advising clients.

41.     Metro, as an employee of Simpson Thacher with access to confidential information, owed a duty or obligation arising from his relationship of trust and confidence to his employer and its clients to keep confidential such nonpublic information.  Metro also had a duty to disclose (or if disclosure was impossible or improper) to abstain from trading upon the material, nonpublic information he possessed.

42.     Metro knew that he was not permitted to trade on the basis of the nonpublic, client-related information he accessed in the course of his employment, and he also knew that he could not provide others with this information, especially when he knew or was reckless in not knowing that the person to whom he provided the information would trade, or cause others to trade, on the basis of the nonpublic information.

43.     By virtue of his employment by Simpson Thacher, and based upon the facts and reasonable inferences, Metro had access through Simpson Thacher's computer network to highly confidential information related to corporate deals, including each transaction listed above.  News of the transactions, when disclosed, had a material impact on the stock prices and/or trading volumes of the public companies associated with 12 of the announcements above. Upon information and belief, the only exception was the potential transaction involving Company A, because that potential transaction did not or has not yet occurred or been made public.

44.     Since at least February 2009, Metro misappropriated and disclosed Simpson Thacher's material, nonpublic client information for the purpose of reaping personal benefit and benefiting the Middleman and others in at least 13 instances.

45.     Metro obtained the confidential, nonpublic information by accessing material on the firm's internal computer system to determine whether a corporate deal was imminent.  Metro told the Middleman that he did so in a way that he believed would leave no evidence that he had accessed the documents, which would possibly expose the scheme.

46.     Metro knew or was reckless in not knowing that he was violating duties he owed to his employer and its clients.  In each instance, Metro violated his duties when he accessed and then misappropriated confidential client information and then used the confidential information for his personal financial benefit by trading in his own brokerage account on the basis of the information, by knowingly or recklessly passing to the Middleman the confidential client information (knowing or being reckless in not knowing that the Middleman and possibly others would trade on the basis of the information), and by trading in the securities of the issuers identified above based on his agreement to share trading profits with the Middleman.

47.     Since at least February 2009, Metro misappropriated and disclosed material, nonpublic client information to realize personal benefit (approximately $168,000 allocated to him pursuant to an agreement with the Middleman) and/or to benefit his friend the Middleman and others in at least 13 instances.

### The Beginning of the Scheme: Sirius XM Radio

48.     The scheme began in early February 2009 at a bar in New York City when the Middleman met Metro and other friends for drinks.  Metro and the Middleman separated from the rest of their friends and began discussing stocks, including the Middleman's current holdings in

14

Sirius XM Radio ("Sirius").  The Middleman expressed worry that shares of Sirius were trading at an extremely low price and that Sirius might go bankrupt.  Metro then told the Middleman that Liberty Media Corp. ("Liberty") planned to invest over $500 million in Sirius.  Metro told the Middleman that he obtained this information by viewing documents at the law firm where he worked; the Middleman understood this to mean that the information was confidential, client information.

49.     Following the discussion with Metro, the Middleman called Eydelman and told him to buy additional shares of Sirius for the Middleman's account.  Eydelman expressed the same concerns to the Middleman that the Middleman had expressed to Metro – namely, concerns about Sirius's viability, including a belief that Sirius might go bankrupt.  The Middleman reassured Eydelman, however, that he had information from a reliable "source" that Liberty planned to make a $500 million investment in Sirius.  The Middleman told Eydelman that his "source" was a friend who worked at a law firm.

50.     On February 12, 2009, the Middleman called Eydelman at 8:24 a.m., and the two spoke for more than two and a half minutes.  The Middleman called Metro at 12:33 p.m. and again at 3:17 p.m.  Eydelman began purchasing shares of Sirius in the Middleman's account at 3:55 p.m. that day, and he later called the Middleman at 4:16 p.m.  That night, the Middleman called Metro at 10:00 p.m., and the two spoke for nearly eight minutes.

51.     On February 12 and 13, 2009, the Middleman purchased 300,000 shares of Sirius for $27,900.

52.     Also on February 13, 2009, a friend of the Middleman's, who also was a client of Eydelman's, purchased 50,000 shares of Sirius for $5,015.

15

53.    On February 17, 2009, Liberty announced its intent to lend Sirius $530 million. The news coverage of the transaction that followed stated that Simpson Thacher acted as legal counsel to Sirius on the deal.

54.    Following the announcement, Eydelman acknowledged to the Middleman the accuracy of the "source's" information, and said, "Nice trade."

55.    Following the announcement, Sirius's stock price closed at $0.16 per share, a $0.06 increase, or 60 percent, over the prior trading day's close with an increased trading volume of more than 40 percent.

56.    The Middleman's potential profits from his purchases based on Metro's tip were $20,100 based on the closing share price on the day of the announcement.   The Middleman ultimately sold the 300,000 shares a few months later, after Sirius's stock price had increased, for a profit of approximately $157,892.  The Middleman's friend (who is also an Eydelman customer) sold 45,000 of his Sirius shares for total profits of approximately $54,922.

57.    The Middleman told Metro following the announcement that he had set aside approximately $7,000 for Metro as a "thank you" for the information.  Instead of taking the money, Metro told the Middleman that the Middleman should leave it in his brokerage account and invest it on Metro's behalf based on confidential information that Metro planned to pass to him in the future.

### The Scheme Matures: Post-Sirius Information Passing

58.    Following the passing of credible, accurate and highly lucrative information related to Sirius, Metro, the Middleman, and Eydelman settled into a routine in which they sought to cloak their gathering and passing of material, nonpublic information.

59.     This routine began by Metro accessing his employer's and his employer's clients' material, nonpublic information using Simpson Thacher's computer network to identify the possible subject of a corporate transaction and important details, such as the transaction's expected timing and premium above the target company's current share price.  Metro then asked the Middleman to meet in person.

60.     Metro and the Middleman typically met at a coffee shop in New York City. Metro passed the confidential, nonpublic information to the Middleman by showing the Middleman his cell phone screen whereon he had typed the names and/or ticker symbols of the two companies involved in the transaction for which he had confidential information.  Metro pointed to the names and/or ticker symbols on his phone to indicate to the Middleman which company was the acquirer and which company was being acquired.  Metro also conveyed the approximate price of the transaction and the approximate announcement date.  The Middleman then communicated to Eydelman that they should meet.

61.     Eydelman and the Middleman met near the clock at the information booth in Grand Central Station.  In advance of this meeting, the Middleman wrote on a post-it note or napkin the name and/or ticker symbol of the company whose stock price was likely to increase as a result of the corporate transaction.  Once at Grand Central Station, the Middleman walked up to Eydelman, showed him the post-it note or napkin, and then chewed up, and sometimes ate, the piece of paper. The purpose of doing so was to destroy the evidence of the tip.  Eydelman watched the Middleman dispose of the paper this way.  The Middleman also conveyed to Eydelman the approximate price of the transaction and the approximate announcement date.

62.     Eydelman then returned to his office, typically gathered research relating to the target company, and then typically emailed the Middleman the research and/or Eydelman's

17

purported thoughts as to why buying the stock made sense.   The purpose of these contrived

emails was to create what Eydelman and the Middleman believed to be a sufficient paper trail that

included a plausible justification for engaging in the transaction.  In reality, Eydelman and the

Middleman had decided to invest in the target company based not on the "research" Eydelman

gathered but on the material, nonpublic information provided by Metro.

### Metro Traded in Advance of Two Announcements and Tipped Material, Nonpublic Information to the Middleman with the Knowledge and Intent that it be Used to Trade Illegally

63.     For each of the 13 corporate transactions, Simpson Thacher and Metro possessed

material, nonpublic information relating to the transaction prior to trading by Metro, Eydelman, or

the Middleman.

64.     Metro traded in advance of two of the 13 corporate transaction announcements

while in possession of material, nonpublic information he misappropriated from his employer.

Metro also had an agreement to share in proceeds from the Middleman's illicit trading based on

the confidential information Metro passed to him.

65.     In each of the 13 instances where he misappropriated confidential client

information from his employer, Metro tipped the Middleman this material, nonpublic information

when he knew or was reckless in not knowing that this information would be used for insider

trading.

66.     Based on Metro's relationship with the Middleman, Metro knew or was reckless

in not knowing that his communications with the Middleman would lead to purchases or sales by

others.  Indeed, through discussions with the Middleman, Metro knew that the Middleman was

passing the information to his broker and that the broker traded on the information.  Further,

18

Metro repeatedly discussed with the Middleman the amount of trading profits in the Middleman's brokerage account that the Middleman had allocated to Metro.

67.     In at least 13 instances, the Middleman tipped Eydelman the misappropriated material, nonpublic information that Metro gave him, knowing that Eydelman would then trade on the basis of that information.

### Eydelman Traded Based on the Information Passed to Him, Which He Knew or Should Have Known was Tipped in Breach of a Duty

68.     As described above, during the Relevant Period Metro knowingly or recklessly tipped the Middleman with material, nonpublic information that Metro misappropriated from Simpson Thacher concerning at least 13 transaction announcements.  In each instance, the Middleman then tipped Eydelman.

69.     Eydelman traded on behalf of his customers in advance of all 13 announcements (for which he received substantial commissions), and traded for himself or his family in advance of 10.

70.     Prior to this trading, the Middleman told Eydelman that the source of the information was a friend of the Middleman's who was an employee at a law firm.  Given Eydelman's position as a registered representative, the information's timeliness and accuracy, and the repeated nature of the tips, Eydelman knew or should have known that the material, nonpublic information passed to him by the Middleman was conveyed in violation of a duty.

71.     The Middleman or Eydelman also passed information to their friends who traded in advance of six transactions.

72.     For the same reasons, as to the four (of the 13) transactions that were tender offers (see paragraphs 120 through 135 and 167 through 210), Eydelman knew or had reason to know

at the time of his purchases that the information he received had been acquired from the offeror, the issuer, or someone working on their behalf.

73.     Upon information and belief, Eydelman exercised discretionary authority with respect to relevant securities purchases in his customers' accounts.  Some of Eydelman's customers' account opening documentation included customer agreements that gave investment advisory or discretionary authority to Eydelman.  Eydelman rarely communicated with his customers in advance of the purchase of shares of the issuers that are the subject of this action, and, in each of the relevant transactions, purchases or sales for multiple customers occurred at the very same time.  Eydelman also marked many of the relevant transactions as "solicited," meaning that he made the decision to make the purchase or sale in question.

74.     After each of the above Simpson Thacher-advised deals was announced, the Middleman, Eydelman, and/or the accounts that they controlled that had purchased the issuer's securities sold their securities and closed their option positions.

### The Deals

#### 1.  Brink's Home Security Holdings, Inc.

75.     On or about December 22, 2008, Simpson Thacher first billed work to its client, Tyco, in connection with Tyco's possible acquisition of Brink's.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

76.     The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to

20

Tyco's possible acquisition of Brink's.  In addition to how the scheme functioned generally, Metro also billed time to Simpson Thacher's client, Tyco, with respect to Tyco's possible acquisition of Brink's.   Additional evidence set forth below outlines other relevant communications and trading by the defendants.

77.     The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

78.     Metro worked for Simpson Thacher and, by virtue of his employment and work in connection with the acquisition, obtained material, nonpublic information regarding Tyco's possible acquisition of Brink's.  Metro knew or was reckless in not knowing that trading upon or the dissemination of this information would violate his duties to his employer and his employer's client.

79.     Metro misappropriated from his employer and its client material, nonpublic information concerning Tyco's possible acquisition of Brink's, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Brink's by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

80.     Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

81.     Metro first billed time in connection with the acquisition on December 29, 2009.

82.     Later that night, at 11:04 p.m., Metro sent a text message to the Middleman.

83.     At 11:13 p.m., Metro transferred $2,500 from his personal bank account to his brokerage account at E*Trade Securities.  He used all of those funds just seven minutes later to place an order to buy 76 shares of Brink's; the order executed at 9:30 a.m. the next day at $32.66 per share.  Metro abused his position of trust with his employer by trading in Brink's securities based on material, nonpublic information.

84.     Over the course of the following day, December 30, 2009, the Middleman called Metro twice, then spoke with Eydelman twice, and then exchanged six more telephone calls with Metro.  Beginning the next morning, December 31, 2009, at 9:36 a.m., Eydelman began to purchase shares of Brink's for some of his customers.

85.     The Middleman and Eydelman (including on behalf of his customers) invested more than $700,000 in shares of Brink's that day.

86.     In addition, Eydelman engaged in a bullish option strategy that would be profitable if the price of Brink's stock increased.  Pursuant to this option strategy, Eydelman sold put option contracts expiring in March with a strike price of $30 and simultaneously purchased call option contracts expiring in March with a strike price of $35.  On December 31, 2009, Brink's closing price was $32.64.

87.     An option contract gives the purchaser the option to buy or sell 100 shares of the underlying stock.  A "call option" gives an investor the right, but not the obligation, to purchase a security at a specified price within a specific time period.  A "put option" gives an investor the right, but not the obligation, to sell a security at a specified price within a specific period of time.

A person who sells, or "writes," an option contract is conveying to another person the right to buy (call) or sell (put) the underlying securities.

88.     Because a call option conveys the right to purchase shares, a buyer of a call option generally anticipates that the price of the underlying security will increase.

89.     Because a put option conveys the right to sell shares, a buyer of a put option generally anticipates that the price of the underlying security will decrease.  The party selling the put option, however, generally anticipates the price of the security will not decrease below the strike price of the option contract.

90.     Thus, by buying "call" options and selling "put" options, Eydelman expressed confidence that the underlying stock price would increase.

91.     Later on the morning of December 31, 2009, the Middleman and Eydelman communicated twice, and then the Middleman and Metro exchanged seven text messages and spoke once by telephone.  Thereafter, the Middleman and Eydelman communicated two additional times by telephone.

92.     As discussed below in paragraphs 282 through 284, Eydelman and the Middleman began exchanging contrived emails about Brink's on December 31, 2009, at 1:29 p.m., after they had decided to purchase and had already begun purchasing shares based on the material, nonpublic information provided by Metro.

93.     Between December 31, 2009, and January 15, 2009, the defendants' communications surged.  The Middleman and Metro communicated by telephone or text 25 times, and the Middleman and Eydelman communicated by telephone or text 25 times.

94.     During this 16-day period, the Middleman, Eydelman, and the accounts of Eydelman's family and customers continued to purchase additional shares of Brink's.  Eydelman

23

also added to his bullish option positions by purchasing "call" options expiring in February with a strike price of $35, even though Brink's closing price at the time of the purchases was less than $33. The Middleman, and Eydelman through his customer accounts, assumed similar bullish option positions.

95.     In addition, Eydelman and the Middleman communicated with friends who also purchased Brink's securities between December 30, 2009, and January 15, 2010. For example, the Middleman began communicating with one friend on December 30, 2009, less than 15 minutes after exchanging texts with Metro. This friend purchased 200 shares of Brink's a few days later. The Middleman also called another friend on December 31, and this friend bought 300 shares of Brink's less than 15 minutes later. On January 12, 2010, an account in the name of one of Eydelman's friend's parents purchased 7,000 shares of Brink's, investing approximately $221,826. Upon information and belief, these purchases followed a communication between Eydelman and the account holders' son.

96.     Between December 30, 2009, and January 15, 2010, Eydelman invested approximately $1,391,254 in shares of Brink's on behalf of his family and his customers, including the Middleman. Eydelman invested another approximately $21,450 in call options on behalf of himself, his family, and the Middleman. In addition, friends of Eydelman's invested approximately $221,826 in shares of Brink's, and the Middleman's friends bought approximately $16,282 worth of Brink's shares. During this time, Eydelman, his customers (including the Middleman), his family, his friends, the Middleman's friends, and Metro purchased approximately 50,916 shares of Brink's, and used the purchase of approximately 460 call options and the sale of 160 put options to further leverage their investment.

97.     On January 18, 2010, which was a holiday, Tyco publicly announced its intention to acquire Brink's for $42.50 per share.  Tyco's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Tyco on the deal.

98.     The following trading day, Brink's stock closed at $41.54 per share, an increase of $10.12, or 32 percent, over the prior trading day's closing price with an increased trading volume of more than 44 times the prior trading day.

99.     Eydelman and the Middleman began selling shares of Brink's on the morning of January 19, 2010, the first trading day after the announcement.  Metro sold his shares six days later, on January 25, 2010, for a profit of approximately $667.

100.    The defendants learned of Tyco's acquisition of Brink's at least three weeks before it was announced, and traded on the basis of that information, eventually generating approximately $773,154 in illicit profits for Metro, Eydelman, Eydelman's family, Eydelman's customers (including the Middleman), and the Middleman's and Eydelman's friends.

101.    On January 29, 2010, Oppenheimer's compliance department forwarded to Eydelman an inquiry received from the Chicago Board Options Exchange ("CBOE") regarding trading in options of Brink's by certain of Eydelman's customers in advance of the Tyco acquisition announcement.  Eydelman responded by attaching several research reports, claiming that he had decided to trade based on his research.  In reality, Eydelman had decided to trade based on the material, nonpublic information about Brink's passed to him by the Middleman from Metro.  Eydelman told the Middleman about this inquiry and how Eydelman intentionally sent the Middleman the contrived emails with research reports in case an inquiry such as this occurred.  The Middleman then told Metro about the inquiry received by Eydelman and Eydelman's false response.

25

102.     On March 15, 2010, Oppenheimer's compliance department forwarded to Eydelman another inquiry, this time from the NYSE, regarding trading in Brink's by certain of Eydelman's customers.  In response, Eydelman forwarded his answers to the CBOE inquiry and suggested that it could be used to respond to NYSE.

103.     Eydelman continued to trade in advance of at least 11 more deals on behalf of himself and his customers on the basis of material, nonpublic information obtained by Metro and provided to Eydelman through the Middleman.

### 2.   *Smithtown Bancorp., Inc.*

104.     On or about May 7, 2010, Simpson Thacher first billed work to its client, People's United Financial, Inc. ("People's"), in connection with People's possible acquisition of Smithtown Bancorp., Inc. ("Smithtown").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

105.     The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to People's possible acquisition of Smithtown.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

106.     The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

107.     By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding People's potential acquisition.  Metro also knew or was reckless in not knowing that

dissemination of this information would violate his duties to his employer and his employer's client.

108.    Metro misappropriated from his employer and its client material, nonpublic information concerning People's possible acquisition of Smithtown, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Smithtown by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

109.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

110.    On July 7, 2010, Metro and the Middleman exchanged four text messages beginning at 9:47 p.m.

111.    The Middleman called Eydelman the next morning at 8:33 a.m.  Approximately two hours later, Eydelman began purchasing Smithtown shares for several of his customers' accounts, as well as for his own account.

112.    On July 9, 2010, at 10:49 a.m., Eydelman emailed the Middleman a research report on Smithtown, dated June 9, 2010.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material,

27

nonpublic information to Eydelman, and after they decided to purchase shares of Smithtown based on the material, nonpublic information provided by Metro.

113.    Over the next week, the Middleman began to purchase shares, and Eydelman continued to add to his position, acquiring shares for his own account and for the accounts of his family members and customers.  Eydelman's friends also purchased shares.  During the evening of July 8, Eydelman and a former fraternity brother exchanged two phone calls.  Less than seven minutes later, the friend began placing orders to purchase shares of Smithtown.  Eydelman's fraternity brother ultimately purchased 4,000 shares of Smithtown between July 9 and 14, and his parents (who also knew Eydelman) purchased another 1,000 shares, also on July 9.

114.    From July 8, 2010 through July 15, 2010, accounts owned or controlled by the Middleman and Eydelman or their friends purchased approximately 220,240 shares of Smithtown for $807,916.

115.    During this time, Smithtown's stock price increased from a closing price of $3.05 on July 7, 2010, to a closing price of $4.01 on July 12, 2010.  Trading by Eydelman, the Middleman, and Eydelman's friends made up approximately 13.6 percent of the total trading volume during this period.

116.    On July 15, 2010, at 4:11 p.m., People's announced a definitive agreement under which it would acquire Smithtown in a cash and stock transaction valued at $4.00 per share. People's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to People's on the deal.

117.    The stock price did not increase on the day of the announcement.  Smithtown's stock price already had increased from July 7 to July 12 to the approximate deal price, which, upon information and belief, was likely due, at least in part, to trading initiated by Eydelman, the

28

Middleman, and Eydelman's friends. Despite this stock price increase, the stock's trading volume increased by 211 percent.

118.    Eydelman, the Middleman, and Eydelman's friends began selling shares of Smithtown on the morning of July 16, 2010, the first trading day after the announcement.

119.    Eydelman and the Middleman learned of People's acquisition of Smithtown at least one week before the announcement, and traded on the basis of that information, eventually generating illicit profits of approximately $29,010 for Eydelman, the Middleman (and, by virtue of their agreement, Metro), other Eydelman customers, and Eydelman's friends.

### 3.   *CNA Surety Corp.*

120.    On or about September 27, 2010, Simpson Thacher first billed work to its client, CNA Financial Corp. ("CNA Financial"), in connection with a possible tender offer for CNA Surety Corp. ("CNA Surety"). In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

121.    The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to CNA Financial's possible tender offer for CNA Surety. The additional evidence set forth below outlines other relevant communications and trading by the defendants.

122.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

123.    By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information

29

regarding CNA Financial's potential tender offer.  Metro also knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

124.    Metro misappropriated from his employer and its client material, nonpublic information concerning CNA Financial's possible tender offer for CNA Surety, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of CNA Surety by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

125.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.  For the same reasons, Eydelman knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

126.    On September 29, 2010, CNA Financial met with Simpson Thacher concerning a possible transaction with CNA Surety.  As of October 19, 2010, substantial steps had been taken toward commencing a tender offer by CNA Financial.

127.    At 5:31 p.m. on October 19, 2010, Metro and the Middleman began an exchange of five text messages.  Thirty minutes later, the Middleman and Eydelman exchanged seven

phone calls that lasted, collectively, over 13 minutes.  Before they began communicating, the Middleman and Metro had last communicated by telephone or text on September 15, 2010.

128.    The next day, the Middleman purchased 2,000 shares of CNA Surety. Approximately 15 minutes later, Eydelman began buying CNA Surety shares for his customers and himself.

129.    On October 21, 2010, the day after their purchases began, Eydelman emailed the Middleman research reports on CNA Surety, dated June 9, 2010.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of CNA Surety based on the material, nonpublic information provided by Metro.

130.    From October 20 through October 29, 2010, the Middleman, Eydelman, Eydelman's customers, and Eydelman's friends invested approximately $1,227,108 to build positions in CNA Surety.  Specifically, the Middleman bought 12,000 shares, Eydelman bought 8,000 shares for himself and another 35,800 shares for his customers, and Eydelman's friends bought 7,950 shares.

131.    Eydelman's friends purchased after calls with Eydelman.  On October 22, Eydelman called a former fraternity brother, who then purchased 1,000 shares later that day.  The two spoke again that evening, and the friend's parents (who also knew Eydelman) bought 750 shares the next trading day.  Similarly, Eydelman spoke with another friend on the afternoon of October 25, whose parents, less than 30 minutes after the call, bought 5,000 shares.  That friend and his parents bought an additional 1,200 shares on October 26.

132.    On November 1, 2010 at 6:00 a.m., CNA Financial announced that it signed a definitive merger agreement pursuant to which CNA Financial would commence a tender offer

to acquire all outstanding shares of common stock of CNA Surety not currently owned by subsidiaries of CNA Financial for $26.55 per share. The $26.55 per share price represented a 38 percent premium to the closing price of CNA Surety's common stock on October 29, 2010. CNA Financial's announcement and the news coverage of the tender offer that followed stated that Simpson Thacher acted as legal counsel to CNA Financial on the deal.

133.    Two hours after CNA Financial's announcement, at 8:09 a.m., Eydelman telephoned the Middleman.  Within half an hour of that call, Eydelman, the Middleman, and the accounts of Eydelman's family members, Eydelman's customers, and Eydelman's friends began selling their shares of CNA Surety.

134.    CNA Surety's trading volume on November 1 surged more than 70 times the prior trading day's volume.

135.    Eydelman and the Middleman learned of CNA Financial's tender offer for CNA Surety approximately 12 days before the announcement, and traded on the basis of that information, eventually generating illicit profits of approximately $241,141 for Eydelman, the Middleman (and, by virtue of their agreement, Metro), and the accounts of Eydelman's family members, Eydelman's customers, and Eydelman's friends.

### 4.   Graham Packaging Co.

136.    On or about February 6, 2011, Simpson Thacher first billed work to its client, Graham Packaging Co., Inc. ("Graham"), in connection with Graham's possible acquisition by Silgan Holdings Inc. ("Silgan").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

137.    The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information

32

to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Silgan's possible acquisition of Graham.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

138.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

139.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Graham's possible acquisition.  Metro also he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

140.    Metro misappropriated from his employer and its client material, nonpublic information concerning Silgan's possible acquisition of Graham, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Graham by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

141.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

142.    On April 11, 2011, Metro and the Middleman exchanged six text messages during a five-minute period.  The Middleman called Eydelman approximately 17 minutes later.  They spoke for over three minutes, and then followed the call with another call that lasted over three and a half minutes.

143.    An hour after these calls, as set forth below in paragraphs 285 through 286, Eydelman sent the Middleman an email providing a purportedly legitimate basis for their future purchase of shares of Graham.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Graham based on the material, nonpublic information provided by Metro.

144.    Following these communications, from April 11, 2011 through April 12, 2011, the Middleman bought 9,000 shares of Graham, Eydelman purchased 15,000 shares for his customers, and a friend of the Middleman bought 1,750 shares for a combined investment of over $430,820.

145.    The next day, on April 13, 2011 at 6:30 a.m., Graham announced the signing of a definitive merger agreement under which Silgan would acquire Graham in a cash-and-stock transaction valued at $19.56 per share.  Graham's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Graham on the deal.  Within two and a half hours of Graham's announcement, the Middleman, Eydelman and the Middleman's friend begin selling shares of Graham.

146.    Graham's stock price closed at $22.22 on April 13, an increase of nearly 33 percent over the prior day's closing price on an increase of nearly 50 times the trading volume.

147.    The defendants learned of Silgan's acquisition of Graham just two days before the announcement, and traded on the basis of that information, eventually generating approximately $105,964 in illicit profits for the Middleman (and, by virtue of their agreement, Metro), the accounts of Eydelman's customers, and the Middleman's friend.

### 5. *SMART Modular*

148.    On or about September 16, 2010, Simpson Thacher first billed work to its client, Silver Lake Partners ("Silver Lake"), in connection with Silver Lake's possible acquisition of SMART Modular Technologies, Inc. (WWH) ("SMART Modular").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

149.    Upon information and belief, the scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Silver Lake's possible acquisition of SMART Modular.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

150.    The information that Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

151.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Silver Lake's possible acquisition, and he knew or was reckless in not knowing that

dissemination of this information would violate his duties to his employer and his employer's client.

152.    Based upon the facts and reasonable inferences, Metro misappropriated from his employer and its client material, nonpublic information concerning Silver Lake's possible acquisition of SMART Modular, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in the shares of SMART Modular by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

153.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

154.    On January 27, 2011, Metro and the Middleman exchanged five text messages and one phone call prior to 3:08 p.m.  About an hour later, Eydelman called the Middleman and the two exchanged four phone calls, the last of which occurred at 4:28 p.m.  The Middleman texted Metro two minutes later.

155.    The next morning, the Middleman and Eydelman exchanged four phone calls.  At 3:22 p.m., one of Eydelman's customers and the employer of one of Eydelman's friends purchased 5,000 shares of SMART Modular.

156.    Early on Monday, January 31, 2011, the Middleman and Eydelman exchanged two phone calls; later that morning, Eydelman began buying shares of SMART Modular for other customers' accounts.  Collectively, Eydelman's customers' accounts purchased 23,000 shares on January 31.

157.    On February 2, 2011, a few minutes after the Middleman and Eydelman spoke, the Middleman entered into a bullish option position by selling 100 April 2011 in-the-money puts with a strike price of $7.50.  A put option is referred to as "in-the-money" when the strike or exercise price of the put option contract is above the current price of the underlying stock.  Two of Eydelman's other customers sold in-the-money put options at this time.  Later that day, the Middleman and Metro exchanged five text messages.

158.    The next day, Eydelman continued to increase his and his customers' bullish position in SMART Modular.  Eydelman sold 100 April in-the-money put options with a strike price of $7.50, while through his customer accounts he bought 45,000 shares and sold 300 April in-the-money put options.

159.    Eydelman and the Middleman engaged in contrived emails regarding SMART Modular beginning on March 20, 2011.   Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of SMART Modular based on the material, nonpublic information provided by Metro.

160.    From February 3, 2011 through April 25, 2011, SMART Modular's share price fluctuated from the low-$6 range to the mid-$8 range.  SMART Modular's low closing price for the period was $6.22 per share on March 16, 2011, and its high closing price during the period was $8.47 on April 8, 2011.  During this period, Eydelman increased and maintained his and his

customers' bullish positions by purchasing additional SMART Modular shares, selling October puts with a strike price of $7.50, and buying April call options with a strike price of $7.50.

161.    Also from February 3, 2011 through April 25, 2011, Eydelman sold some of his customers' shares of SMART Modular and covered previously established option positions. Upon information and belief, Eydelman sold these shares to capture profits due to SMART Modular's short-term price changes during this time or to liquidate assets to fund other timely purchases (*e.g.*, Graham Packaging, discussed above).  Throughout this period, Eydelman and the Middleman, and the accounts of Eydelman's customers, maintained bullish positions in SMART Modular.

162.    One of the Middleman's friends purchased 4,000 shares of SMART Modular on March 14, following a more than ten minute telephone call with the Middleman.  This friend doubled his position on April 13.  Similarly, a friend of Eydelman's purchased 750 shares of SMART Modular on April 4 and added 500 more shares on April 14, both times within days of communicating with Eydelman.

163.    Between January 31, 2011, and April 19, 2011, Eydelman, the Middleman, and accounts belonging to Eydelman's customers and to friends of Eydelman and the Middleman invested approximately $6,272,785 to acquire approximately 947,150 shares of SMART Modular.  They invested another $68,750 to acquire approximately 450 call options and 1,150 put options.  They also sold approximately 3,150 put options during this time period.

164.    On April 26, 2011 at 8:30 a.m., SMART Modular announced that it had agreed to be acquired by Silver Lake and its affiliate, Silver Lake Sumeru, for $645 million.  Silver Lake offered $9.25 a share in cash, which was approximately 13 percent above SMART Modular's closing price on April 25.  SMART Modular's shares also saw an increase in trading volume of

more than 24 times the prior trading day's volume.  The announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Silver Lake on the deal.

165.   Eydelman, Eydelman's family members and customers, the Middleman, and the Middleman's and Eydelman's friends began selling shares of SMART Modular within 40 minutes of the announcement.

166.   Upon information and belief, the defendants learned of Silver Lake's possible acquisition of SMART Modular prior to the transaction's announcement, and traded on the basis of that information, eventually generating approximately $1,575,382 in illicit profits for Eydelman, Eydelman's family members and customers, the Middleman (and, by virtue of their agreement, Metro), and the Middleman's and Eydelman's friends.

### 6. Vital Images

167.   On September 15, 2010, Toshiba formally engaged Simpson Thacher to serve as its legal adviser with respect to a possible tender offer for Vital.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

168.   Upon information and belief, the scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, and how the Middleman passed information to Eydelman, worked in the same manner with respect to Toshiba's possible tender offer for Vital. The additional evidence set forth below outlines other relevant communications and trading by Eydelman in his customer accounts.

169.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

170.    By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Toshiba's potential tender offer, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

171.    Upon information and belief, Metro misappropriated from his employer and its client material, nonpublic information concerning Toshiba's possible tender offer for Vital, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman. Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Vital by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

172.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.  For the same reasons, Eydelman knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

173.    On January 28, 2011, Toshiba and Vital executed a confidentiality and standstill agreement and Vital began providing Toshiba with nonpublic documents.  On February 16,

Toshiba submitted its non-binding indication of interest to acquire all of the outstanding shares of common stock of Vital at a price of $17.00-18.00 per share.  On April 6, 2011, Simpson Thacher provided the first draft of the merger agreement to counsel for Vital.  As of April 4, 2011, the date of the first purchase by Eydelman's customers, substantial steps had been taken toward commencing a tender offer by Toshiba.

174.    On April 1, 2011, Metro and the Middleman exchanged five text messages beginning at 4:33 p.m.  Then on April 4, 2011, Metro and the Middleman exchanged two more text messages beginning at 9:39 a.m.

175.    On April 4, 2011, at 4:04 p.m., Eydelman began purchasing Vital shares in his customer accounts.  Eydelman purchased 19,000 shares for approximately $153,151 between April 4 and April 21, 2011 in his customer accounts.  Upon information and belief, the Middleman passed to Eydelman the material, nonpublic information he had received from Metro concerning Vital prior to Eydelman purchasing shares on behalf of his customers.

176.    Prior to the merger announcement, between April 25 and April 27, 2011, Eydelman sold 16,300 of the Vital shares he had purchased in his customer accounts.  Vital's stock price had increased from April 4 through April 25, which resulted in profits of $14,317.  Following the announcement, Eydelman sold the remaining 2,700 shares for profits of approximately $24,916.

177.    Following the close of the stock market on April 27, 2011, Toshiba and Vital issued a joint press release announcing the transaction pursuant to which a subsidiary of Toshiba would acquire all outstanding Vital shares for $18.75 per share through a cash tender offer.  Vital's stock price closed at $18.66 the next trading day, which represented a 31.45 percent increase over the prior day's closing price.  Toshiba's announcement and the news coverage of

41

the acquisition that followed stated that Simpson Thacher acted as legal counsel to Toshiba on the deal.

### 7.   International Coal

178.    On or about March 11, 2011, Simpson Thacher first billed work to its client, Arch Coal Inc. ("Arch Coal"), in connection with a possible tender offer for International Coal, Inc. ("International Coal").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

179.    The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Arch Coal's possible tender offer for International Coal.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

180.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced. By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Arch Coal's potential tender offer, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

181.    Metro misappropriated from his employer and its client material, nonpublic information concerning Arch Coal's possible tender offer for International Coal, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his

42

communications with the Middleman would lead to trading in shares of International Coal by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

182.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.  For the same reasons, Eydelman knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf..

183.    On April 20, 2011, International Coal provided a draft merger agreement to Arch Coal and Simpson Thacher.  As of April 28, 2011, substantial steps had been taken toward commencing a tender offer by Arch Coal.

184.    On the night of April 28, 2011, Metro and the Middleman exchanged seven text messages.

185.    The next morning, the Middleman and Metro exchanged three more text messages and, approximately one hour later, the Middleman and Eydelman began exchanging phone calls. They exchanged eight phone calls from 11:33 a.m. through 2:20 p.m.

186.    Three minutes after their last call, Eydelman sent the Middleman an email recommending the purchase of International Coal.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of International Coal based on the material, nonpublic information provided by Metro.

187.    Later that day, at 3:32 p.m., the Middleman bought 40,000 shares, and Eydelman then purchased for his other customers another 28,500 shares of International Coal.  They invested approximately $755,808 to quickly acquire these positions.

188.    On May 2, 2011 at 7:30 a.m., Arch Coal announced that it would buy International Coal for $3.4 billion in cash.  Arch Coal offered $14.60 for every International Coal share, a premium of 32 percent over International Coal's closing price on April 29, 2011.  Arch Coal's announcement and the news coverage that followed stated that Simpson Thacher acted as legal counsel to Arch Coal on the deal.

189.    Within two hours of the announcement, Eydelman and the Middleman began selling shares of International Coal.

190.    Shares of International Coal closed at $14.42, a 30.7 percent increase over the prior day's closing price with an increase in trading volume of more than 18 times the prior day's trading volume.

191.    The defendants learned of Arch Coal's tender offer for International Coal approximately four days before it was announced, and traded on the basis of that information, eventually generating approximately $231,276 in illicit profits in accounts belonging to Eydelman's customers (including the Middleman and, by virtue of their agreement, Metro).

### 8.  *PharMerica Corp.*

192.    Upon information and belief, Simpson Thacher served as legal counsel to PharMerica Corporation ("PharMerica"), Omnicare Corporation ("Omnicare"), or a third party involved in connection with Omnicare's tender offer for PharMerica.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

193.   Upon information and belief, the scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Omnicare's possible tender offer for PharMerica.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

194.   The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

195.   By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Omnicare's potential tender offer, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

196.   Upon information and belief, Metro misappropriated from his employer and its client material, nonpublic information concerning Omnicare's possible tender offer for PharMerica, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of PharMerica by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

197.   Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.

45

Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.  For the same reasons, Eydelman knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

198.   On June 17, 2011, the Chief Executive Officer of Omnicare contacted the Chief Executive Officer of PharMerica to inform him that he was sending him a letter expressing Omnicare's interest in exploring a potential business combination with PharMerica where Omnicare would purchase all of the outstanding shares of PharMerica. As of June 17, 2011, substantial steps had been taken toward commencing a tender offer by Omnicare.

199.   On June 20, 2011, Metro and the Middleman exchanged three texts between 9:02 a.m. and 2:40 p.m.  On June 21, 2011, Metro and the Middleman exchanged 11 texts between 9:01 a.m. and 11:30 a.m.

200.   Eydelman began purchasing shares for himself at 12:07 p.m. on June 21, followed shortly thereafter by purchases on behalf of his customers, including the Middleman.  Upon information and belief, the Middleman passed to Eydelman the material, nonpublic information he had received from Metro concerning PharMerica prior to Eydelman purchasing shares for himself or his customers.

201.   At 12:11 p.m., Eydelman sent the Middleman an email with a news report that PharMerica had hired a financial adviser and had begun accepting bids for the company.  Upon information and belief, Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of PharMerica based on the material,

nonpublic information provided by Metro. The Middleman and Eydelman communicated by telephone at 12:12 p.m.  Seven minutes later, the Middleman responded to Eydelman's email.

202.    Two hours later, Eydelman entered into a bullish option position by selling put option contracts expiring in December with a strike price of $15.   Eydelman sold additional put options the next day for himself and the Middleman.  On June 21, PharMerica's closing price was $13.36, and it was $12.65 on June 22.  The strike price of $15 matched the price per share that Omnicare would publicly announce it was offering for PharMerica two months later.

203.    From June 21, 2011, through August 22, 2011, PharMerica's share price fluctuated from the mid-$10 range to the high-$13 range.  PharMerica's low closing price for the period was $10.69 per share on August 8, 2011, and its high closing price during the period was $13.89 per share on July 8, 2011.  During this period, Eydelman increased and maintained his and his customers' bullish positions by purchasing additional PharMerica shares and selling additional put options expiring in December 2011 and March 2012 with strike prices of $15 and $17.50.

204.    Also during this period, Eydelman sold a small number of some of his customers' shares of PharMerica and covered a small number of previously established option positions. Upon information and belief, Eydelman did so to capture profits due to PharMerica's short-term price changes during this time.  Throughout the period, Eydelman and the Middleman, and the accounts that Eydelman controlled, maintained bullish positions in PharMerica.

205.    One of Eydelman's friends purchased shares of PharMerica, beginning on June 24, just minutes after a nearly three minute phone call between the two men.  Approximately one hour later, the friend's parents also began purchasing shares of PharMerica.

206.    Between June 21, 2011, and August 22, 2011, Eydelman, his family members and customers, the Middleman, and Eydelman's friends invested approximately $7,543,880 to purchase approximately 695,650 shares of PharMerica.  They also bought approximately 1,511 call options for approximately $143,270.

207.    On August 23, 2011, at 7:01 a.m., Omnicare announced that it had provided PharMerica's board of directors with a proposal to acquire all of PharMerica's outstanding commons shares for $15.00 per share in a transaction estimated to be worth $716 million.  The proposed share price was approximately 25.9 percent above the average closing price over the prior 30 days and approximately 37.2 percent above PharMerica's closing price on August 22.

208.    Eydelman, his family members and customers, the Middleman, and Eydelman's friends began selling shares of PharMerica within seven minutes of the market opening on August 23.

209.    On August 23, PharMerica's closing price was $13.89, as compared to $10.93 on August 22.  Moreover, PharMerica's shares saw an increase in trading volume of more than 2,300 percent over the prior day's trading volume.

210.    The defendants learned of Omnicare's possible tender offer for PharMerica prior to the transaction's announcement and traded on the basis of that information, eventually generating approximately $1,517,092 in illicit profits for Eydelman, his family members and customers (including the Middleman and, by virtue of their agreement, Metro), and Eydelman's friends.

### 9.   Collective Brands

211.    Simpson Thacher served as legal counsel to J.P. Morgan Securities LLC, J.P. Morgan Chase Bank, and Wells Fargo Securities, LLC with respect to Wolverine World Wide,

Inc.'s efforts to obtain financing to fund the acquisition of the Performance + Lifestyle group business of Collective Brands, Inc. ("Collective Brands"). In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

212. The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Wolverine World Wide, Inc.'s efforts to obtain financing to fund the acquisition of Collective Brands. The additional evidence set forth below outlines other relevant communications and trading by the defendants.

213. The information that Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

214. By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the acquisition, and he knew or was reckless in not knowing that dissemination of this information would violate a his duties to his employer and his employer's client.

215. Metro misappropriated from his employer and its client material, nonpublic information concerning Wolverine World Wide's possible acquisition of Collective Brands, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman. Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Collective Brands by

the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

216.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

217.    On April 2, 2012, starting with an 8:01 a.m. text from Metro, Metro and the Middleman exchanged three text messages.

218.    On April 16, 2012, Eydelman and the Middleman spoke for eight minutes beginning at 2:26 p.m. and then again for over four minutes at 3:05 p.m.

219.    In between these two calls, Eydelman sent the Middleman an email with a news report that Collective Brands was accepting bids for the company.  The Middleman responded to the email one minute after their second telephone call.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Collective Brands based on the material, nonpublic information provided by Metro.

220.    Approximately 10 minutes later, Eydelman bought 300 call options expiring in May with a strike price of $20.  Six minutes later, he bought 200 more call options with the same expiration and strike price.

221.    At 3:53 p.m., Eydelman purchased for a customer 60 call options expiring in May with a strike price of $20, followed closely by the Middleman's purchase of 700 May call options with the same strike price at 3:58 p.m.  Other purchases by Eydelman for various

customer accounts followed.  Collective Brands closed the day's trading with a per-share price of $ 19.32.

222.     From April 17 through April 20, 2012, Eydelman continued to buy call options and shares of Collective Brands for several of his customers' accounts, as well as himself and a family member.

223.     The purchasing between April 16 and April 20 resulted in a combined position of approximately 98,800 shares and 3,655 options.  Eydelman invested approximately $1,956,772 to acquire the shares of Collective Brands and another approximately $288,465 to acquire the options.  During this time, Eydelman also sold 50 put options in one customer's account.

224.     On April 23, 2012, news leaked that Wolverine World Wide and others had submitted bids to acquire Collective Brands, and on April 24, 2012, Collective Brands announced that its Board of Directors, together with management, would conduct a review of strategic and financial alternatives.

225.     On May 1, 2012, Collective Brands announced that it entered into a definitive agreement under which Wolverine World Wide and others would acquire Collective Brands for $21.75 per share in cash.  News coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to initial purchasers and lenders on the deal.  On May 1, Collective Brands' closing price was $21.16 per share, a $0.39 increase over the closing day's price of $20.77 per share.  Trading volume in Collective Brands on May 1 also jumped by more than 822 percent over the prior day's trading.

226.     The defendants learned of the possible acquisition of Collective Brands approximately one month prior to its announcement, and traded on the basis of that information,

eventually generating approximately $360,775 in illicit profits for the Middleman (and, by virtue of their agreement, Metro), Eydelman, Eydelman's family members, and Eydelman's customers.

### 10.   Company A

227.    Upon information and belief, in 2012 Simpson Thacher served as legal counsel to a party in connection with a corporate transaction concerning Company A.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

228.    Upon information and belief, the scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to the possible corporate transaction concerning Company A.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

229.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

230.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the potential merger, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

231.    Based upon the facts and reasonable inferences, Metro misappropriated from his employer and its client material, nonpublic information concerning a corporate transaction involving Company A.  Metro then knowingly traded based on the information and also

knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman. Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Company A by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

232.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

233.    Metro texted the Middleman on May 10, 2012 at 12:15 p.m.  At 3:22 p.m., Metro purchased 2,400 shares of Company A.  Metro added another 320 shares the following day. Metro invested approximately $33,699 to make these purchases.

234.    On May 14, 2012, the Middleman and Eydelman exchanged two calls beginning at 9:39 a.m.

235.    Eydelman began purchasing options on Company A on May 14, 2012, at 3:39 p.m.  He then followed this purchase with stock and option purchases in his customer accounts, including for the Middleman.

236.    At 6:16 p.m., Eydelman sent the Middleman research on Company A.  Upon information and belief, Eydelman sent this email to the Middleman after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Company A based on the material, nonpublic information provided by Metro.

237.     Eydelman continued buying shares and pursuing his typical bullish option strategy for the next two and a half months.  He added some additional shares and options contracts over the subsequent two months, but not at nearly the same rate.  Throughout this entire period, Eydelman invested approximately $7,858,048 on behalf of himself, his family, and his customers (including the Middleman) to purchase approximately 627,815 shares of Company A and another $1,701,848 to purchase approximately 10,825 options.

238.     Upon information and belief, the possible corporate transaction concerning Company A has not materialized, nor has it been made public.

239.     Company A's stock price began to steadily decrease in the second half of 2012.  As a result, Metro, the Middleman, Eydelman, and Eydelman's customers lost money on their purchases of Company A's securities.

240.     One of Eydelman's customers complained to Eydelman's then employer, Oppenheimer, about losses from Company A in accounts belonging to the customer and the customer's family members.  Oppenheimer provided the customer with a copy of a customer agreement, purportedly signed by the customer, which had provided Eydelman with discretionary authority over the customer's account.  Later, however, Eydelman admitted to the Middleman that he had forged the customer's signature on the customer agreement document around the time when the customer opened the account.  Eydelman left Oppenheimer shortly after the customers filed the complaints.

### *11. Sealy Corp.*

241.    Simpson Thacher served as legal counsel to Sealy Corp. ("Sealy") with respect to a possible merger between Sealy and Tempur-Pedic International Inc. ("Tempur-Pedic").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

242.    The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Sealy's possible merger with Tempur-Pedic.  The additional evidence set forth below outlines other relevant communications and trading by the defendants.

243.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

244.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the potential merger, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

245.    Metro misappropriated from his employer and its client material, nonpublic information concerning Tempur-Pedic's possible acquisition of Sealy, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of Sealy by the Middleman

and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

246.    Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

247.    On September 19, 2012, only eight days before the transaction was announced, Metro texted the Middleman.  The Middleman called Eydelman 40 minutes later.  The Middleman and Eydelman spoke again later that afternoon.

248.    The following day, the Middleman called Eydelman at 11:50 a.m.

249.    At 12:54 p.m., Eydelman emailed the Middleman and suggested that he buy shares of a mattress company "following the recent rebound of the housing market and all of the builders' stocks."  Eydelman pointed to two research reports on Sealy, one of which was negative; the other was neutral.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Sealy based on the material, nonpublic information provided by Metro.

250.    At 1:45 p.m., Eydelman bought 7,500 shares of Sealy on behalf of one of his customers.  Before the market closed for the day, Eydelman purchased an additional 8,500 shares of Sealy for the same customer. Eydelman also purchased 5,300 shares of Sealy for his children's accounts later that afternoon.

251.    The next morning, September 21, 2012, the Middleman called Eydelman, and Eydelman soon after purchased an additional 7,000 shares on behalf of a different customer.

252.    Also following this call between the Middleman and Eydelman, the Middleman directed the purchase of 80,000 Sealy shares for a family member's account.

253.    In addition, also on the morning of September 21, the Middleman began purchasing 61,000 shares of Sealy in an account belonging to his girlfriend.

254.    The buying continued on Monday, September 24.  Eydelman purchased an additional 24,700 shares of Sealy in his children's accounts, and the Middleman purchased 20,000 shares in his own account.

255.    From September 20 through September 25, Eydelman and the Middleman invested approximately $463,876 to acquire 214,000 shares of Sealy in accounts in the names of themselves, their family members, the Middleman's girlfriend, and an Eydelman customer.

256.    On September 27, 2012 at 7:00 a.m., Tempur-Pedic and Sealy announced that they had signed a definitive agreement to create a $2.7 billion global bedding provider. Specifically, Tempur-Pedic agreed to acquire all of the outstanding common stock of Sealy for $2.20 per share, representing a premium of approximately 23 percent to Sealy's 30-day average closing price.  Tempur-Pedic and Sealy's announcement and the news coverage that followed stated that Simpson Thacher acted as legal counsel to Sealy.

257.    Within two and a half hours of the announcement, the Middleman, Eydelman's family members and customer, and the Middleman's family members and girlfriend begin to sell shares of Sealy.

258.    Sealy's trading volume on September 27 increased more than 38 times its trading volume on the day before the announcement.

57

259.    The defendants learned of Tempur-Pedic's possible acquisition of Sealy approximately eight days before it was announced, and traded on the basis of that information, eventually generating approximately $14,509 in illicit profits for the Middleman (and, by virtue of their agreement, Metro), Eydelman's family members and customer, and the Middleman's family members and girlfriend.

### 12. OfficeMax

260.    Simpson Thacher served as legal counsel to Office Depot, Inc. ("Office Depot") with respect to a possible acquisition of OfficeMax, Inc. ("OfficeMax"). In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

261.    The scheme described above generally in paragraphs 58 through 62, including the method by which Metro accessed confidential client information, how Metro passed information to the Middleman, how the Middleman passed information to Eydelman, and the contrived emails between the Middleman and Eydelman, worked in the same manner with respect to Office Depot's possible acquisition of OfficeMax. The additional evidence set forth below outlines other relevant communications and trading by the defendants.

262.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the possible acquisition was publicly announced.

263.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the transaction, and he knew or was reckless in not knowing that dissemination of this information would violate his duties to his employer and his employer's client.

264.     Metro misappropriated from his employer and its client material, nonpublic information concerning Office Depot's possible acquisition of OfficeMax, and knowingly or recklessly tipped the Middleman, who in turn passed this information to Eydelman.  Given Metro's relationship with the Middleman, Metro knew or was reckless in not knowing that his communications with the Middleman would lead to trading in shares of OfficeMax by the Middleman and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to the Middleman.

265.     Eydelman knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Eydelman knew that the Middleman's source was employed at a law firm, and he also knew that the Middleman's source had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that Eydelman received.

266.     On January 30, 2013, at 1:30 p.m., less than three weeks before news of the merger emerged, Metro sent a text message to the Middleman.  Metro and the Middleman then exchanged an additional 11 text messages over the next half-hour period.  Before they began communicating, the Middleman and Metro had last communicated by telephone or text on December 31, 2012.

267.     The Middleman called Eydelman the next morning and then exchanged 10 telephone calls with Eydelman.  Ten minutes after their last call, the Middleman purchased 12,000 shares of OfficeMax, followed by purchases by Eydelman for himself and several of his customers.

268.     That same day, the Middleman also took a bullish option position in OfficeMax, buying 400 call options expiring in February 2013 with a strike price of $11.  The stock price closed at $10.78 that day.

269.     From January 31, 2013 through February 15, 2013, the Middleman and Eydelman, on behalf of himself, his family, and his customer, bought approximately 151,100 shares of OfficeMax for approximately $1,635,614 and bought approximately 2,010 call options for approximately $96,138.

270.     Eydelman sent the Middleman an email on February 12, 2013, at 4:03 p.m., with a news report about OfficeMax.  Eydelman sent this email after Metro had passed material, nonpublic information to the Middleman, after the Middleman had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of OfficeMax based on the material, nonpublic information provided by Metro.

271.     On February 18, 2013, which was a holiday, the *Wall Street Journal* reported that OfficeMax and Office Depot were in advanced merger talks.  OfficeMax's stock price surged the next day, opening at $13.57 per share, or approximately a 24 percent increase over the prior trading day's close.  The trading volume in the stock increased by more than 536 percent.  The news coverage that followed the initial Wall Street Journal report indicated that Simpson Thacher acted as legal counsel to Office Depot on the deal.

272.     The defendants learned of Office Depot's possible acquisition of OfficeMax approximately three weeks before news of the transaction leaked, and traded based on that information, eventually generating approximately $573,332 in illicit profits for themselves and Eydelman's family and customers.

**Metro's Conduct was Intentional and Deceptive**

273.    Metro's conduct was calculated, repeated, and egregious.  As a Simpson Thacher employee and law school graduate, Metro knew or was reckless in not knowing that he was obligated to keep confidential information that he received in the course of his employment by Simpson Thacher.  Despite this knowledge, Metro traded in advance of at least two transactions for which Simpson Thacher served as an adviser while in possession of material, nonpublic information.

274.    Metro's conduct was neither isolated nor aberrational.  Metro knowingly or recklessly passed to the Middleman information Metro knew to be material and nonpublic, over and over again, on at least 13 occasions.  Metro knew that trading on material, nonpublic information was wrong, and he attempted to conceal his participation in the scheme by entering into an agreement with the Middleman whereby the Middleman would keep proceeds due to Metro in the Middleman's brokerage account for later distribution.  Metro further knew that the Middleman received contrived emails from his broker for the purpose of providing purportedly legitimate bases for their trading.

275.    The steps Metro took to hide his misappropriation of Simpson Thacher's client information are strong evidence that he knew his actions were in breach of his duty to his employer and his employer's client.  Metro intentionally obtained the material, nonpublic information by accessing documents on Simpson Thacher's internal computer systems in such a way as to leave no evidence that he had accessed the information.  Throughout the scheme, Metro and the Middleman established a course of conduct to minimize the possibility of detection.  They intentionally limited telephone and text communications to seemingly innocuous statements, such as "let's meet for coffee."  Following these communications, they

would meet and Metro would convey the material, nonpublic information to the Middleman by pointing to stock ticker symbols on his smartphone so as to not document any evidence of a communication.

276.     Metro received a personal benefit from his gift of material, nonpublic information to his friend, the Middleman, in the form of giving valuable, confidential information to a long-term friend.  Metro also expected to receive a financial benefit from his tips to the Middleman because he and the Middleman agreed that a portion of the Middleman's trading profits would be allocated for eventual payment to Metro.

**Eydelman's Conduct was Intentional and Deceptive**

277.     Likewise, Eydelman's conduct was calculated, repeated, and egregious.

278.     Eydelman knew that the Middleman's "source" was a friend who worked at a law firm and had access to material, nonpublic information.  Indeed, in a recent meeting between the Middleman and Eydelman, when the Middleman brought up the "boy at the law firm," Eydelman responded, "What's up with him . . . does he still have the info?"

279.     Eydelman's deception was also evidenced in a recent discussion with the Middleman concerning how to compensate Metro, so that Metro would continue to provide them with tips.  During this discussion, Eydelman suggested, "We got to figure out a way to get him some cash, right . . . you got to give him cash cash."  Following this conversation, Eydelman subsequently met with the Middleman and provided him with approximately $7,000 in cash for the Middleman to give to Metro.

280.     Based on the facts and reasonable inferences, including Eydelman's experience as an industry professional and the repeated, prescient, and highly lucrative information passed on by the Middleman, Eydelman also knew or should have known that the Middleman was

providing him with material, nonpublic information obtained in violation of a duty.  Eydelman therefore had an obligation to disclose (or if disclosure was impossible or improper) to abstain from trading upon the material, nonpublic information he possessed.  Despite being a licensed professional with training and awareness of the prohibition on trading on the basis of material nonpublic information obtained in breach of a duty, Eydelman engaged in this illegal behavior over and over again.  In fact, Eydelman engaged in this behavior at least another 11 times after receiving an inquiry from Oppenheimer's compliance department.

281.    The Middleman and Eydelman took steps to avoid detection.  These steps included the following: (a) meeting in a well-traveled, highly trafficked, and noisy location – Grand Central Station; (b) destroying evidence (the Middleman, while Eydelman watched, chewed up, and sometimes ate, the post-it note or napkin identifying the name and/or ticker symbol of the firm whose stock price would increase as a result of the transaction); (c) Eydelman's conscious effort to create a legitimate looking paper trail for outside observers by sending the Middleman emails containing research that Eydelman gathered on the subject companies and/or Eydelman's purported thoughts on the companies after the Middleman passed Eydelman the material, nonpublic information, and after the Middleman and Eydelman had already decided to trade on the basis of that information; and (d) Eydelman intentionally provided false information to his employer, CBOE, and the NYSE when specifically asked about the reasons for trades he directed in Brink's, as discussed above.

## **Contrived Emails**

282.    Eydelman's email correspondence with the Middleman evidences both Eydelman's intent to deceive and an understanding that his conduct was improper.  Eydelman frequently crafted contrived emails around the time of his and the Middleman's initial trading in

many of the securities to cover-up their illicit conduct with a false paper trail, using Eydelman's work email address, reciting purportedly non-fraudulent (but false) bases for the trades. In every instance, however, at the time they concocted these emails, the Middleman had *already* received from Metro material, nonpublic information, and the Middleman *already* had passed the information to Eydelman. Moreover, these communications contain no reference to the fact that Eydelman and the Middleman already had met in person and were furiously exchanging text messages and telephone calls. And in many instances, these communications occurred *after* Eydelman and the Middleman had already begun to purchase the securities in question.

283. For example, with respect to the trading in Brink's, on December 31, 2009, at 1:29 p.m., Eydelman sent the Middleman an email containing two Brink's research reports, to which the Middleman responded: "Outperform nice!!" Eydelman then responded:

> I like this one. . . . considering that, short term, whether the mkt continues to rally or not is so uncertain – this one is good since their business should be recession proof. So being long it now gives us exposure to the mkt while having downside protection in a company with a growing business in any sort of an economy.

284. However, as detailed above in paragraphs 75 through 103, Eydelman and the Middleman exchanged these emails *after* Metro tipped the Middleman and *after* the Middleman tipped Eydelman. In addition, Eydelman sent the email less than an hour and a half *after* the Middleman and Metro exchanged seven text messages, *after* the Middleman and Eydelman exchanged two phone calls, and *after* Eydelman bought Brink's shares for his personal and customers' accounts. And, despite Eydelman's supposed conclusion that the security was a good long-term, "recession proof" investment, Eydelman and the Middleman, the accounts they controlled, and their friends *all* held the securities for less than a month.

285. Similarly, the Middleman and Eydelman exchanged contrived emails to conceal their true reason for investing over $430,000 in Graham Packaging, namely, the material,

nonpublic information the Middleman had already received from Metro and that the Middleman

had passed to Eydelman.  On April 11, 2011, at 2:32 p.m., Eydelman sent to the Middleman an

email saying:

> we just announced that we are participating in a secondary offering
> for gpk [Graphic Packaging Holding Company], a packaging
> company.  this sector looks solid.  we can't buy this one for you as
> it is restricted here but there is another one in the group (grm)
> [Graham] that is down from 18 to 16.45.  i think it is timely to get
> some of this.

The Middleman immediately responded: "OK I think I want to sell SMOD and back up the truck

on this to see if it pops a bit because of the GPK offering."

286.    However, as described above in paragraphs 136 through 147, Eydelman and the

Middleman exchanged these emails *after* Metro tipped the Middleman and *after* the Middleman

tipped Eydelman.  Additionally, Eydelman's first email was sent two hours *after* a string of text

messages between the Middleman and Metro, *after* two calls between the Middleman and

Eydelman, and immediately before Eydelman and the Middleman began buying shares of

Graham Packaging.  Moreover, there is little positive correlation between the impact of a

secondary offering in one packaging company on the stock price of another, *different* packaging

company,  making the Middleman's purported belief that the stock price of Graham would

"pop[]" make little sense.

287.    Similar, contrived emails between Eydelman and the Middleman accompanied the

defendants' trading in all of the relevant issuers with the exception of Vital.  Upon information

and belief, Eydelman did not send the Middleman an email regarding Vital because, even though

the Middleman received material, nonpublic information regarding Vital from Metro and passed

that information to Eydelman, the Middleman decided not to trade in Vital personally.

288.    For at least one of the deals, Eydelman also marked many of the purchases of the securities in his customer accounts as "unsolicited," meaning that the purchases were supposedly directed by his customers.  The purchases, however, were made on the same day in at least 10 accounts and, upon information and belief, were not, in fact, directed by Eydelman's customers. Indeed, the purchases followed a communication with the Middleman.  On information and belief, Eydelman mislabeled these purchases to hide the fact that he was trading on the basis of material, nonpublic information that he knew or should have known he had received in breach of a duty.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

289.    The Commission realleges and reincorporates paragraphs 1 through 288 as if fully set forth herein.

290.    With respect to their trading preceding each merger announcement described above, Defendants Eydelman and Metro, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:

(a)    employed devices, schemes, or artifices to defraud;

(b)    made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

291.    By reason of the actions alleged herein, Defendants Eydelman and Metro violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)
### (Against All Defendants)

292.    The Commission realleges and reincorporates paragraphs 1 through 288 as if fully set forth herein.

293.    With respect to their trading, specifically selling options, preceding announcements involving  issuers Brink's, SMART Modular, PharMerica, Collective Brands, and OfficeMax described above, Defendants Eydelman and Metro, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities:

(a)    employed devices, schemes, or artifices to defraud;

(b)    obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or;

(c)    engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

294.    By reason of their actions alleged herein, Defendants Eydelman and Metro violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and unless restrained and enjoined will continue to do so.

**THIRD CLAIM FOR RELIEF**

**Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder**
**(Against All Defendants)**

295.  The Commission realleges and reincorporates paragraphs 1 through 288 as if fully set forth herein.

296.  Prior to the public announcement of the tender offers for International Coal, CNA Surety, Vital Images, and PharMerica, and after a substantial step or steps to commence each of the aforementioned tender offers had been taken, Metro, while in possession of material information relating to each of the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material, nonpublic information relating to each of the tender offers to the Middleman under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities referenced above.

297.  Prior to the public announcement of the tender offers for the companies and after a substantial step or steps to commence each of the tender offers had been taken, Eydelman, personally and/or in his customers' accounts, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased securities in each of the companies identified in paragraphs 17, 20, 22, and 27 above.

298.  By reason of their actions alleged herein, Defendants Metro and Eydelman violated

Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(i)       finding that the Defendants Metro and Eydelman violated the antifraud provisions of the federal securities laws as alleged herein;

(ii)      permanently enjoining each Defendant from violating Securities Act Section 17(a) [*15 U.S.C. § 77q(a)*], Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and Exchange Act Section 14(e) [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder;

(iii)     ordering each Defendant to jointly and severally disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received by any person or entity, including but not limited to all direct and indirect tippees, as a result of the actions alleged herein;

(iv)      ordering Defendants Metro and Eydelman to pay civil monetary penalties under Section 21A of the Exchange Act [*15 U.S.C. § 78u-1*] and Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*]; and

(v)       granting such other relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: March 19, 2014                              Respectfully submitted,


                                   */s/ Stephan J. Schlegelmilch*
                                   Stephan J. Schlegelmilch (D.C. Bar No. 983874)
                                   *Counsel for Plaintiff*
                                   U.S. SECURITIES AND EXCHANGE COMMISSION
                                   100 F Street, N.E.
                                   Washington, D.C.  20549
                                   Email: SchlegelmilchS@SEC.gov
                                   Phone: (202) 551-4935
                                   Facsimile: (202) 772-9292


Of Counsel:

    Bridget M. Fitzpatrick
    Daniel M. Hawke
    Antonia Chion
    Robert A. Cohen
    Jason J. Burt
    Carolyn M. Welshhans

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By:  _/s/ Stephan J. Schlegelmilch_____
Stephan J. Schlegelmilch (D.C. Bar No. 983874)
*Counsel for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549

**DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Rule 101.10, because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, Paul Blaine, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

   */s/ Stephan J. Schlegelmilch*
Stephan J. Schlegelmilch (D.C. Bar No. 983874)
*Counsel for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549